## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ELIZABETH SKISTIMAS and JOHN SKISTIMAS, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>DANIMER SCIENTIFIC, INC. f/k/a LIVE OAK ACQUISITION CORP., STEPHEN A. CROSKEY, and JOHN A. DOWDY, III,<br><br>　　　　　　　　　　Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Elizabeth Skistimas and John Skistimas ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Danimer Scientific, Inc. ("Danimer" or the "Company") f/k/a Live Oak Acquisition Corp. ("Live Oak") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Danimer; and (c) review of other publicly available information concerning Danimer.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired Danimer securities between October 28, 2020 and May 4, 2021, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Danimer is a performance polymer company that develops and produces bioplastic replacements for traditional petrochemical-based plastics. It sells polyhydroxyalkanoates ("PHAs") under the brand name Nodax for a wide variety of plastic applications, including water bottles, straws, and food containers.

3.     On or about December 29, 2020, Meridian Holdings Group., Inc. ("Meridian") d/b/a Danimer Scientific ("Legacy Danimer") became a public entity via merger with Live Oak, a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

1

4.     On Saturday, March 20, 2021, *The Wall Street Journal* published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say" addressing, among other things, Danimer's claims that Nodax, a plant-based plastic that Danimer markets, breaks down far more quickly than fossil-fuel plastics. The article alleges that according to several experts on biodegradable plastics, "many claims about Nodax are exaggerated and misleading." According to the article, Jason Locklin, the expert who co-authored the study touted by Danimer as validating its material, stated that Danimer's marketing is "sensationalized" and that making broad claims about Nodax's biodegradability "is not accurate" and is "greenwashing."

5.     On this news, the Company's stock price fell $6.43 per share, or roughly 13%, to close at $43.55 per share on March 22, 2021.

6.     On April 22, 2021, Spruce Point Capital Management ("Spruce Point") published a research report entitled "When the Tide Goes Out, What Will Wash Ashore?" In addition to the concerns about Danimer's product biodegradability claims, the report found "multiple conflicting sources of Danimer's facility sizes and production capacity" and "inconsistencies between reported figures and city filings for Kentucky facility capital costs." The report also raised doubts about the strength of the Company's purported partnerships with Pepsi and Nestlé because Pepsi recently sold its equity stake in Danimer and "both the top Pepsi and Nestlé executives with close relationships to Danimer recently resigned."

7.     On this news, the Company's stock price fell $2.01, or 8%, to close at $22.99 per share on April 22, 2021, on unusually heavy trading volume.

8.     On May 4, 2021, Spruce Point published a follow-up report. Citing information obtained via a Freedom of Information Act ("FOIA") request from the Kentucky Department of

Environmental Protection, the report alleged that "Danimer's production figures, its pricing, and rosy financial projections are wildly overstated" and that its Kentucky facility received a notice of compliance violations from the Division for Air Quality. Moreover, "Danimer's PHA average selling price appears to be 30% - 42% below management's claims."

9.      On this news, the Company's stock price fell $4.48, or 20%, over three consecutive trading sessions to close at $17.66 per share on May 6, 2021, on unusually heavy trading volume

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that biodegradable materials such as Nodax could take years to break down; (2) that, as a result, the Company's marketing claims that Nodax products could biodegrade within months were exaggerated and misleading; (3) that monthly biopolymer production and natural gas usage at the Company's Kentucky and Georgia facilities were materially overstated; (4) that Danimer faced compliance violations for its Kentucky facility from the Division of Air Quality; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiffs, as set forth in the accompanying certifications, incorporated by reference herein, purchased Danimer securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Danimer is incorporated under the laws of Delaware with its principal executive offices located in Bainbridge, Georgia. Danimer's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DNMR." Prior to the Merger, Live Oak's principal executive offices were located in Great Falls, Virginia, and its Class A common stock traded on the NYSE under the symbol "LOAK," and its warrants traded under the symbol "LOAK WS."

18.     Defendant Stephen A. Croskey ("Croskey") was the Chief Executive Officer ("CEO") of Danimer at all relevant times.

19.     Defendant John A. Dowdy, III ("Dowdy") was the Chief Financial Officer ("CFO") of Danimer at all relevant times.

20.     Defendants Croskey and Dowdy (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Danimer is a performance polymer company that develops and produces bioplastic replacements for traditional petrochemical-based plastics. It sells polyhydroxyalkanoates ("PHAs") under the brand name Nodax for a wide variety of plastic applications, including water bottles, straws, and food containers.

22.     On or about December 29, 2020, Meridian Holdings Group., Inc. d/b/a Danimer Scientific became a public entity via merger with Live Oak, a blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

**Materially False and Misleading**
**Statements Issued During the Class Period**

23.     The Class Period begins on October 28, 2020. On that day, the Company filed a

Registration Statement on Form S-4 with the SEC for the proposed Merger. It stated, in relevant

part:

> Since 2020, Danimer has sold PHAs commercially under its proprietary Nodax®
> brand name for usage in a wide variety of plastic applications including water
> bottles, straws, food containers, among others. Our PHA biopolymers are
> formulated to meet the biodegradability requirements for ASTM International and
> European (EN) standards. Our PHA is also FDA-approved for food contact and
> will biodegrade aerobically or anaerobically in soil, water and industrial or home
> compost within three to six months depending on conditions.

24.     The Registration Statement was subsequently amended on November 30, 2020,

December 15, 2020, and December 16, 2020 on Forms S-4/A. The Company also filed a

prospectus on Form 424b3 on December 16, 2020. The amended Registration Statements and

prospectus contained substantially the same statements as identified in ¶ 23.

25.     On November 17, 2020, Danimer announced that it would produce biodegradable

drinking straws for quick service restaurants. The press release stated, in relevant part:

> Eagle Beverage will manufacture the straws using Danimer Scientific's
> proprietary biopolymer, Nodax™ polyhydroxyalkanoate (PHA). Tested by
> University of Georgia (UGA) researchers and the UGA New Materials Institute,
> PHA is made from sustainable materials, such as canola oil, to produce a proven
> biodegradable alternative to traditional petrochemical plastics. The straws are
> expected to be available for Eagle Beverage's QSR customers to purchase in early
> 2021. After launching the straws, Eagle Beverage plans to explore expanding its
> offerings to include compostable food containers, packaging and more.
>
> "Reducing the impact of plastic waste is a critical issue across the country, but
> consumers have limited ways to find eco-friendly alternatives at fast food
> restaurants," said Eagle Beverage Vice President Aisha Kabani. "By partnering
> with Danimer Scientific to produce a reliably biodegradable straw, we will
> provide a cost-effective solution for restaurants to deliver guilt-free beverage
> enjoyment to their customers. ***Petrochemical straws break down into harmful***
> ***microplastics and never fully degrade, but these PHA straws will completely***
> ***degrade in a matter of months.***"

26.     On December 29, 2020, Danimer announced the completion of the merger in a

press release that also stated:

> Danimer Scientific is a pioneer in creating environmentally responsible and
> natural alternative solutions to traditional petroleum-based resins. The Company's
> **signature polymer, Nodax™ PHA (polyhydroxyalkanoate), is a 100%**
> **biodegradable, renewable, and sustainable plastic produced using canola oil as**
> **a primary feedstock. Nodax™ PHA is the first PHA polymer to be certified as**
> **marine degradable, the highest standard of biodegradability, which verifies the**
> **material will fully degrade in ocean water without leaving behind harmful**
> **microplastics**. As a result, NodaxTM offers a better beginning-of-life and end-of-
> life cycle than any of today's traditional plastics and can replace the 80% of
> plastics that are never recycled or incinerated.
>
> Danimer Scientific is currently producing and shipping NodaxTM at a
> commercial scale level from its existing facility in Winchester, Kentucky. The
> Company has partnered with key manufacturers and consumer products
> companies such as PepsiCo, Nestlé, Bacardi, Genpak, WinCup, Columbia
> Packaging Group, Kemira and Plastic Suppliers Inc. as they introduce more
> sustainable alternatives to straws, food and beverage containers, and flexible
> packaging, among others. Based on signed and pending contracts, the Company is
> fully sold out of all production in its Kentucky facility and will use its increased
> capital base to significantly increase production in seeking to meet the expected
> current and long-term demand of its customer base.

27.     On January 28, 2021, Danimer filed a registration statement on Form S-1 with the

SEC, which was declared effective on February 16, 2021 following certain amendments. Also on

February 16, 2021, the Company filed a prospectus on Form 424b3. These documents

characterized Danimer as delivering "renewable, environmentally friendly bioplastic materials to

global consumer product companies." As to biodegradability, the Company stated:

> PHA is a naturally occurring bioplastic that effectively biodegrades in both
> anaerobic environments, such as a waste treatment facility, and aerobic
> environments, such as an ocean. PHA will degrade in environments in which
> microbes or fungi are present, without the presence of heat and moisture . . . .
> PHA is degradable in industrial compost, home compost, soil, fresh water, marine
> water and anaerobic conditions . . . . Danimer's Nodax® PHA possesses seven
> TUV AUSTRIA certifications and statements of industrial and home
> compostability, is biodegradable in anaerobic soil, freshwater and marine
> environments and is 100% bio-based.

28.     The above statements identified in ¶¶ 23-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) that biodegradable materials such as Nodax could take years to break down; (2) that, as a result, the Company's marketing claims that Nodax products could biodegrade within months were exaggerated and misleading; (3) that monthly biopolymer production and natural gas usage at the Company's Kentucky and Georgia facilities were materially overstated; (4) that Danimer faced compliance violations for its Kentucky facility from the Division of Air Quality; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

29.     The truth began to emerge on March 20, 2021 when *The Wall Street Journal* ("WSJ") published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say" addressing, among other things, Danimer's claims that Nodax, a plant-based plastic that Danimer markets, breaks down far more quickly than fossil-fuel plastics. The article alleges that according to several experts on biodegradable plastics, "many claims about Nodax are exaggerated and misleading." According to the article, Jason Locklin, the expert who co-authored the study touted by Danimer as validating its material, stated that Danimer's marketing is "sensationalized" and that making broad claims about Nodax's biodegradability "is not accurate" and is "greenwashing." The article stated, in relevant part:

> Nodax breaks down far more quickly than fossil-fuel plastics, which can last for hundreds of years. But many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics. They say more testing and stricter regulations are needed, and warn that marketing products as marine biodegradable could encourage littering. ***Biodegradable straws, bottles and bags can persist in the ocean for several years, they say.***
>
> "***The claims are what I would call sensationalized***," Jason Locklin, a University of Georgia professor, said of Danimer's Nodax marketing. Mr. Locklin directs the

university's New Materials Institute and co-authored a study cited by Danimer as validating its material.

\*     \*     \*

Mr. Locklin's study—described in marketing material by Danimer and its customers as verifying Nodax as "a truly biodegradable alternative to petrochemical plastics"—showed that Nodax in powdered form breaks down quickly, but that the rate is much more variable when tested as a film, the form used to make bags, straws and bottles.

***Making broad claims about Nodax's biodegradability "is not accurate," said Mr. Locklin, adding: "I think that's greenwashing."***

Danimer says its claims are factual. "The material truly is biodegradable so we're not greenwashing," said its chief technology officer, Phil Van Trump. "The only thing that will potentially change is how long it takes to biodegrade."

Rum giant Bacardi is working with Danimer to develop Nodax plastic spirits bottles by 2023. Its marketing materials call Nodax a "plant-based wonder material" and say the upcoming bottles will "disappear" in 18 months.

Bacardi says the claim is based on internal tests and a separate certification Danimer has received from TUV on a lab test showing that a sheet of the raw material used to make the bottle will disintegrate by 90% in seawater within 12 weeks. Extrapolating from this, Bacardi and Danimer say a Nodax spirits bottle would break down within 18 months in the ocean.

***But variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months***, according to Ramani Narayan, a professor at Michigan State University who has been researching biodegradable plastics for over 30 years.

The marine biodegradability test used to gain certification from TUV is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit). But the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life, Mr. Narayan said. He compares it to bread, which gets moldy less quickly inside the fridge.

***At some ocean temperatures, Nodax straws could take between five and 10 years to biodegrade, he said. Bags and bottles could take even longer.***

Mr. Van Trump called that assessment a "worst-case scenario" and said even Danimer's most conservative testing shows far quicker biodegradation. Rodolfo Nervi, Bacardi's sustainability head, said he is confident the upcoming bottle will be 100% biodegradable in 18 months.

30.     On this news, Danimer's stock price fell $6.43 per share, or roughly 13%, to close at $43.55 per share on March 22, 2021.[1]

31.     On March 29, 2021, Danimer reported its fourth quarter and full year 2020 financial results in a press release. Regarding its facility expansion, the Company stated:

**Facility Network Expansion Updates**

Market demand remains robust for Danimer's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), *a 100% biodegradable, renewable, and sustainable plastic produced using canola oil as a primary feedstock.* Expanding commitments from blue chip multinational consumer packaging customers support Danimer's announced nameplate capacity additions to collectively produce and deliver up to an estimated 315 million pounds of finished PHA product per year.

- The Winchester, Kentucky facility is currently producing and shipping PHA at a commercial scale. In 2020, Danimer completed Phase I of its two-phase facility expansion, adding 20 million pounds of nameplate production capacity for the manufacture of PHA-based finished product. The facility started production runs in March 2020. The production ramp was negatively impacted by the COVID pandemic as well as the Company's decision to conserve cash given the uncertainty in the economy. We are continuing to increase production volume at this facility. Building on this initial success, Phase II of the expansion is in process to bring the plant to its anticipated full capacity of 65 million finished pounds annually. Based on the timing of the completion of the merger with Live

---

[1] On April 8, 2021, Danimer issued a response attempting to rebut the WSJ article. Specifically, it included a letter by Dr. Jason Locklin, who had been quoted in the article, which stated:

The article includes two quotations attributed to me. While I don't question that I said the quoted words, to the best of my memory, my statements were in reaction to broad marketing claims by converters or brands selling PHA-based products without proper context that biodegradation time is variable with environmental conditions. **To the best of my knowledge, I was not made aware during the interview, and I am not otherwise aware, of any such marketing claims made by Danimer Scientific, Inc. (producer of "Nodax," a PHA copolymer) that are "sensationalized" or constitute "greenwashing" in my opinion.**

(Emphasis in original.) However, as pointed out by Spruce Point, *infra*, Dr. Locklin and the University of Georgia "have significant financial ties to Danimer, [which] the Company has tried to obscure by removing press releases [published between 2012 and 2017] from its website," one of which "is the announcement of funding to University of Georgia Labs." Moreover, the WSJ did not issue any retraction or correction to its article in response to Dr. Locklin's letter.

Oak, the construction of the Phase II expansion began in December 2020 and is now expected to come online in the second quarter of 2022.

- Today the Company announced that it plans to double the anticipated capacity of its previously disclosed greenfield facility from 125 million to 250 million finished pounds of PHA products annually. To be located in Bainbridge, Georgia, the new state-of-the-art facility is currently in the pre-construction engineering stage, and we expect to break ground in the first quarter of 2022. The greenfield capacity will come online in two phases, with an initial three fermenters expected to be operational in mid-2023 and the second set of three fermenters anticipated to come online in early 2024. Based on the current demand pipeline, the Company continues to forecast that capacity at the greenfield plant will be sold out.

32.     On March 30, 2021, Danimer filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"), affirming the previously reported financial results. Regarding government regulation, the Company stated, in relevant part:

**Government Regulation**

Regulation by government authorities in the United States and other countries is a significant factor in the production and marketing of our products and our ongoing R&D activities. In order to research, develop, and manufacture products for our customers and ultimately for consumer use, we must satisfy mandatory procedures and standards established by various regulatory bodies. Compliance with these standards is complex, and failure to comply with any of these standards can result in significant consequences.

Some applications for which our biopolymers may be suitable, such as food packaging, PHA-coated paper cups and drinking straws, involve food contact, which, in the United States, is regulated by the U.S. Food and Drug Administration ("FDA"). Our PHA has been cleared for use in food-contact applications by the FDA. The PHA polymer is also contained on positive lists for food-contact in the European Union and Japan. We are in the process of seeking further regulatory approvals necessary to sell and produce our products based on local requirements in various jurisdictions worldwide, and we are prepared to seek additional such approvals as may become necessary in the ordinary course of business.

*       *       *

***Changes in government regulations encouraging the use of biodegradable alternatives to plastic products may have an adverse effect on our business.***

We anticipate one of the key markets for our products being compostable and biodegradable substitutes for non-biodegradable plastics, which are created in part by laws, regulations and policies designed to encourage or mandate the increased use of compostable and biodegradable alternatives to plastics. Several countries and other political subdivisions of countries have enacted or are considering enacting such laws and regulations. Failure to implement these or similar laws and regulations and changes to existing laws and regulations may adversely affect the demand for our product candidates in the future.

33.    The above statements identified in ¶¶ 31-32 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) that monthly biopolymer production and natural gas usage at the Company's Kentucky and Georgia facilities were materially overstated; (2) that Danimer faced compliance violations for its Kentucky facility from the Division of Air Quality; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

<u>**Disclosures at the End of the Class Period**</u>

34.    On April 22, 2021, Spruce Point published a research report entitled "When the Tide Goes Out, What Will Wash Ashore?" In addition to the concerns about Danimer's product biodegradability claims, the report found "multiple conflicting sources of Danimer's facility sizes and production capacity" and "inconsistencies between reported figures and city filings for Kentucky facility capital costs. The report also raised doubts about the strength of the Company's purported partnerships with Pepsi and Nestlé because Pepsi recently sold its equity stake in Danimer and "both the top Pepsi and Nestlé executives with close relationships to Danimer recently resigned." Specifically, regarding the biodegradability claims, Spruce Point noted that the Company made changes to its presentations following the publication of WSJ article:



35.     The report also cited a scientific article from 2020 entitled "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," which indicated that the Company's claims about the biodegradability of Nodax were overstated. Specifically, the article found that "PLA-based bioplastics showed a similar biodegradability of PHAs," and that PHA-based bioplastics, such as Nodax, had "less than 10% of biodegradability over a period of one year in aquatic environments, while biodegradation was in general below 50% after one year in soil environment."

36.     On this news, the Company's stock price fell $2.01, or 8%, to close at $22.99 per share on April 22, 2021, on unusually heavy trading volume.

37.     On May 4, 2021, Spruce Point published a follow-up report. Citing information obtained via a Freedom of Information Act ("FOIA") request from the Kentucky Department of Environmental Protection, the report alleged that "Danimer's production figures, its pricing, and

rosy financial projections are wildly overstated." Moreover, "Danimer's PHA average selling

price appears to be 30% - 42% below management's claims." Specifically, it stated:

- Newly released FOIA provides actual biopolymer production figures by location. We find that Danimer's monthly PHA biopolymer production and natural gas usage for its Kentucky facility have been materially misreported, in some months by 100%

   o By law, Danimer most provide semi-annual and annual production figures in Kentucky

   o In its 2020 annual filing, signed in Jan 2021 after closing its SPAC deal on the NYSE in December 2020, we observe it reported material errors that overstated Kentucky's figures in some months by up to 100% by including Georgia's production

   o We are able to extrapolate Georgia's monthly production in H1 2020 and *find mathematically impossible results, implying negative monthly production in April and June 2020.* What's clear is that Georgia production was trending negative in H1 2020

   o <u>**Warning**</u>: The compliance reports are produced by an independent environmental consultant. We find the reports have been signed off on by three different Danimer employees, The "corrected" filing was signed by CTO Phil Van Trump, after previously being signed by Plant Manager Kevin Walsh (Plant Manager: H1 2020) and David Mazzei (Project Manager: 2019). Why hasn't the CFO or COO signed off on these figures? There are legal implications, including potential imprisonment, for filing false information

- Now with certified production figures from Danimer, we estimate PHA Average Selling Prices (ASPs) are overstated by 30% – 42%

   o Danimer's October 2020 Investor Presentation implied PHA ASPs of $3.00/lb. and the CEO alluded to pricing in the $2.50-$2.70/lb. range on the year end conference call in March 2021

   o However, based on Danimer's 2.5m lbs. of certified actual production, and $4.4m of reported PHA sales, we estimate PHA ASPs were closer to $1.74/lb, or 30% - 42% lower than discussed by management. Danimer's Investor Presentation said it was in a "Fully Sold-Out" position. Even if we assume a one-month lag between production and shipment, ASP would still be $2.01/lb. or 20% - 33% below management's claims

- o Warning: Bullish analyst equity models assume ASPs of $2.50/lb, falling to $2.20/lb. in 2025, and $2.00/lb. by 2030 vs. our evidence that ASPs are closer to $1.74/lb. today. We believe Danimer is set to vastly disappoint investors and suffer severe price target cuts

- Actual production implied from Danimer's reported monthly numbers is so far below stated capacity that it severely calls into question why it is telling investors it needs more capacity?

  - o <u>Kentucky</u>: FOIA shows permitted production of 500,000 lbs. monthly vs. recent production of ~330,000 lbs. monthly (34% less)

  - o <u>Georgia</u>: FOIA shows 2020 monthly production started at ~55,000 lbs. and kept declining to ~40,000 lbs. per mid year, even going negative. It's not entirely clear if this PHA or PLA production. However, public sources suggest its Georgia facility does 15,000 tons (30,000,000 lbs.) of annual PLA production

  - o <u>Warning</u>: If Danimer's business were booming to the degree it suggests exists through "Fully Sold-Out" customer demand, why isn't it operating at full capacity with its existing manufacturing base before adding more capacity? We will also show how product sales growth recently turned negative in Q4 2020, but is being obscured by Danimer's financial reporting

- The Kentucky FOIA also raises other serious concerns about Danimer's environmental regulation claims:

  - o Danimer fails to disclose any aspects of environmental regulation on its business in its 10-K "Risk Factors"

  - o However, documents reveal that Danimer received violation notices in Kentucky, and needed extensive state permitting for water and air. It is now clear that Danimer's production process emits Volatile Organic Compounds (VOCs) and methanol

  - o So, while Danimer touts its products to be environmentally friendly through biodegradability, it's clear that the byproducts of its process produce harmful chemicals needing regulation

  - o Danimer is not currently regulated in Georgia, through a county exemption

    - ▪ However, Danimer is now talking about a greenfield expansion to double capacity in Georgia from 125m to 250m lbs. This is in light of recent production figures of just 50,000 lbs. per month. Assuming this capacity expansion occurs, we believe Danimer could face stringent

environmental permitting requirements which will add cost
and complexity to its plans

38.     Moreover, the report cited a January 29, 2020 letter from Hall Environmental

Consultants, LLC submitted to acquire a permit on behalf of Danimer Scientific Kentucky, Inc.,

which demonstrated that the Company's internal controls related to its production figures were

deficient. Specifically, the letter stated:

> *It should be noted that natural gas usage and bioplastic production numbers*
> *are slightly different from what was submitted for the 2020 first-half*
> *semiannual report.* Danimer was in the process of changing their national gas
> supplier and there was some confusion on the reported usages. *In addition, the*
> *bioplastic production numbers that were previously submitted included*
> *production from the companies [sic] Georgia location.* The facility was not able
> to operate in January/February of 2020 as the facility had yet to construct. *The*
> *updated information provided in this report accurately reflects what actually*
> *occurred at this facility in 2020.*

39.     Regarding compliance violations noted by the Kentucky Division of Air Quality,

the report contained a copy of an Air Inspection Report from an inspection in November 2020,

which noted:

**Overall Compliance Status:** Out of Compliance- Notice of Violation (NOV)

| Investigation Results |
| --- |
| **SI:** AIOO110040 |
| **SI Description:** Major Source |
| **Inspector Comment:** AI 110040 |

**Requirement:** Sources subject to this administrative regulation shall not construct, reconstruct, or modify without a permit or permit revision issued under this administrative regulation. [401 KAR 52:030 Section 3(1)(a)]

**Compliance Status:** V-Out of Compliance-NOV

**Comment:** On November 18, 2020, Mr. Hoehne stated that the facility had started construction on what is going to be another process building. I observed broken ground, rebar, gravel, and two cranes on site for construction. I took photographs to document my findings.

**Requirement:** § 61.145 (a) Applicability. To determine which requirements of paragraphs (a), (b), and (c) of this section apply to the owner or operator of a demolition or renovation activity and prior to the commencement of the demolition or renovation, thoroughly inspect the affected facility or part of the facility where the demolition or renovation operation will occur for the presence of asbestos, including Category I and Category II nonfriable ACM. The requirements of paragraphs (b) and (c) of this section apply to each owner or operator of a demolition or renovation activity, including the removal of RACM as follows: [40 CFR 61.145(a)]

**Compliance Status:** V-Out of Compliance-NOV

**Comment:** An asbestos survey was not conducted prior to demolition activities beginning that may have disturbed suspect asbestos containing materials.

**Requirement:** (b) Notification requirements. Each owner or operator of a demolition or renovation activity to which this section applies shall: (1) Provide the Administrator with written notice of intention to demolish or renovate. Delivery of the notice by U.S. Postal Service, commercial delivery service, or hand delivery is acceptable. [40 CFR 61.145(b)]

**Compliance Status:** V-Out of Compliance-NOV

**Comment:** A Kentucky Division for Air Quality Notification of Demolition form was not submitted prior to demolition activities beginning.

40. On this news, the Company's stock price fell $4.48, or 20%, over three consecutive trading sessions to close at $17.66 per share on May 6, 2021, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

41. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Danimer securities between October 28, 2020 and May 4, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

42. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Danimer's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Danimer shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Danimer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Danimer; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

47.     The market for Danimer's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Danimer's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Danimer's securities relying upon the integrity of the market price of the Company's securities and market information relating to Danimer, and have been damaged thereby.

48.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Danimer's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Danimer's business, operations, and prospects as alleged herein.

49.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Danimer's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

50.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

51.     During the Class Period, Plaintiffs and the Class purchased Danimer's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

52.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Danimer, their control over, and/or receipt and/or modification of Danimer's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Danimer, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

53.    The market for Danimer's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Danimer's securities traded at artificially inflated prices during the Class Period.  On February 10, 2021, the Company's share price closed at a Class Period high of $64.29 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Danimer's securities and market information relating to Danimer, and have been damaged thereby.

54.    During the Class Period, the artificial inflation of Danimer's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Danimer's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Danimer and its business, operations, and prospects, thus causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

55.     At all relevant times, the market for Danimer's securities was an efficient market for the following reasons, among others:

(a)     Danimer shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Danimer filed periodic public reports with the SEC and/or the NYSE;

(c)     Danimer regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Danimer was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for Danimer's securities promptly digested current information regarding Danimer from all publicly available sources and reflected such information in Danimer's share price. Under these circumstances, all purchasers of

Danimer's securities during the Class Period suffered similar injury through their purchase of Danimer's securities at artificially inflated prices and a presumption of reliance applies.

57.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Danimer who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

59.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Danimer's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

61.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Danimer's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Danimer's financial well-being and prospects, as specified herein.

63.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Danimer's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Danimer and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

65.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Danimer's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Danimer's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Danimer's securities during the Class Period at artificially high prices and were damaged thereby.

67.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding the problems that Danimer was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Danimer securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

70.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

71.     Individual Defendants acted as controlling persons of Danimer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Danimer and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 19, 2021

By:  *s/ Gregory B. Linkh*

**GLANCY PRONGAY & MURRAY LLP**
Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

and

Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Attorneys for Plaintiff Elizabeth and John Skistimas*

**SWORN CERTIFICATION OF PLAINTIFF**

**DANIMER SCIENTIFIC INC. SECURITIES LITIGATION**

I, Elizabeth Skistimas, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead
   Plaintiff motion on my behalf.

2. I did not purchase the Danimer Scientific Inc. securities that are the subject of this
   action at the direction of plaintiff's counsel or in order to participate in any private
   action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at
   deposition and trial, if necessary.

4. My transactions in Danimer Scientific Inc. securities during the Class Period set forth
   in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class
   under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive
   my pro rata share of any recovery or as ordered or approved by the court, including
   the award to a representative plaintiff of reasonable costs and expenses (including lost
   wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

5/8/2021                                    _Elizabeth Skistimas_
_____                    _____
Date                                                 Elizabeth Skistimas

**Elizabeth Skistimas's Transactions in Danimer Scientific, Inc. (DNMR)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 2/19/2021 | Bought | 1,655 | $45.58 |
| 3/23/2021 | Sold | -1,655 | $40.27 |

**SWORN CERTIFICATION OF PLAINTIFF**

**DANIMER SCIENTIFIC INC. SECURITIES LITIGATION**

I, John Skistimas, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Danimer Scientific Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Danimer Scientific Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

5/8/2021                                        *John Skistimas*
_____          _____
        Date                                        John Skistimas

**John Skistimas's Transactions in Danimer Scientific, Inc. (DNMR)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 2/19/2021 | Bought | 1,425 | $45.72 |
| 3/23/2021 | Sold | -1,425 | $40.27 |